UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

BOB BARR and
WAYNE A. ROOT and
RICHARD KERR and
SIMON MCCLURE and
LIBERTARIAN PARTY,

       Plaintiffs

v.                            Civil Action No. 2:08-0990

BETTY IRELAND,
Secretary of State,

       Defendant

## MEMORANDUM OPINION AND ORDER

Pending is plaintiffs' motion for a preliminary injunction, filed upon the institution of this action on August 13, 2008.  The defendant ("Secretary") filed her answer to the complaint on August 28, 2008.[1]

Counsel have advised the court that the testimony and exhibits offered at the August 27, 2008, hearing, together with the telephone conference between the court and counsel on August 28, 2008, constitute the entirety of the evidentiary record in the case, and that further factual development is not needed.

---

[1]The court notes an August 29, 2008, filing by the Secretary styled "Memorandum of Law in Support of Defendant's Motion to Dismiss."  No motion to dismiss accompanied the filing.  To the extent the Secretary intended to seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), the discussion which follows obviates the need to address the request.

Essentially, the facts are agreed, or at least not in dispute, save for the inferences to be drawn therefrom.  Having provided the required notice, and obtaining the consent of counsel during the teleconference held August 28, 2008, the court ORDERS that the trial on the merits of this action be, and it hereby is, advanced and consolidated with the August 27, 2008, evidentiary hearing pursuant to Federal Rule of Civil Procedure 65(a)(2).


I.


A.   History of the Challenged Requirements and Their Comparison
     to the Approach in Other Jurisdictions


West Virginia requires citizen groups seeking ballot access for their presidential ticket, <u>inter</u> <u>alia</u>, (1) to obtain certificates bearing a number of West Virginia registered voter signatures "equal to not less than two percent of the entire vote cast at the last preceding general election for any presidential candidate[,]" and (2) to file the certificates "not later than the first day of August preceding the [applicable] general election . . . ."  W. Va. Code § 3-5-23(a), (c).  These two conditions are referred to herein respectively as "the 2%

2

requirement" and "the August 1 deadline;" and jointly as "the two requirements."  The 2% requirement is 15,118 signatures for 2008 based upon the votes cast in the 2004 general election.

Former Representative Barr and Mr. Root are, respectively, the Libertarian Party's candidates for president and vice-president ("the Barr/Root campaign").  Mr. Kerr and Mr. McClure support the Barr/Root campaign.  Counsel agree that the Barr/Root campaign is subject to the two requirements.

The August 1 deadline became effective June 6, 1986. 1986 Acts of the Legis. 576-77.  The 2% requirement, previously 1%, became effective June 11, 1999.  1999 Acts of the Legis. 557. Multiple third-party or independent presidential tickets have satisfied the two requirements in 2000, 2004, and 2008.  In 2000, the Reform Party met the two requirements.  For 2004, Ralph Nader and a Libertarian Party presidential candidate did likewise.

For 2008, three political entities attempted compliance with the two requirements.  Two candidacies, the Constitution Party and Ralph Nader, were successful.  The Constitution Party submitted a total of 21,706 signatures, with 16,070 receiving

validation.[2]  Ralph Nader submitted a total of 25,836 signatures, with 18,535 receiving validation.[3]

The third petitioning applicant for 2008 was the Libertarian Party/Barr/Root campaign, which submitted signatures as follows:

| Date | Signatures | Validated by County Clerks | Validation Percentage |
|------|-----------|---------------------------|----------------------|
| July 24, 2008 | 1,097 | | |
| July 31, 2008 | 1,866 | | |
| Subtotal | 2,963 | 2,136 | 72.09% |
| August  1, 2008 | 10,208 | | |
| August 20, 2008 | 10,652 | | |

None of the signatures received on August 1 and 20, 2008, have been distributed to the county clerk offices for validation.

The Barr/Root campaign learned on August 10 and August 28, 2008, that it did not qualify for the ballot for failure to satisfy the two requirements.  The Secretary lodged the August 1 and 20 certificates pending the outcome of this litigation.

According to the chart furnished by the parties, appearing as document 16 on the docket, all 50 states have at

---

[2]The signatures were submitted on four separate dates as follows: October 29, 2007 (4,655), April 22, 2008 (3,225), May 12, 2008 (3,434), and August 1, 2008 (10,392).

[3]The signatures were submitted on four separate dates as follows: June 9, 2008 (11,289), June 30, 2008 (5,784), July 25, 2008 (7,308), and August 1, 2008 (1,455).

least one signature submission deadline, either for entities

seeking full political party ballot access or for individual

candidates seeking ballot access for one political office, or

both.  While it has been held that the legislative choices of

other states are irrelevant[4], there would seem to be some value

in examining the August 1 deadline with reference to the

signature submission deadline used for individual candidates in

other states.[5]

---

[4]Swanson v. Worley, 490 F.3d 894, 910 (11th Cir. 2007)
("This Court in Libertarian Party[of Florida v. State of Florida,
710 F.2d 790 (11th Cir. 1983)] instructed that the legislative
choices of other states are irrelevant, however, because a court
is 'no more free to impose the legislative judgments of other
states on a sister state than it is free to substitute its own
judgment for that of the state legislature.' Libertarian Party,
710 F.2d at 794.  Furthermore, the Supreme Court has upheld a
broad array of election schemes, and we confine our inquiry to
whether Alabama's election scheme is constitutional, not whether
Alabama's scheme is the best relative to other states.").

[5]Comparisons are notoriously difficult inasmuch as ballot
requirements vary greatly across the country.  See Wood v.
Meadows, 207 F.3d 708, 710 (4th Cir. 2000)("Wood II") ("The
variations and complexities of the election laws of the several
states complicate . . . . [the required analysis].  Not only do
states mandate different filing dates, but they permit different
periods of time for signature collection and require different
numbers of signatures. In addition, a state may, or may not,
permit voters who sign independent candidates' petitions to vote
in party primaries."); Socialist Workers Party v. Hechler, 890
F.2d 1303, 1305 (4th Cir. 1989) (noting "the wide variation in
the approaches of different states to the problem of ballot
access.")  This divergence has caused one respected jurist to
conclude that it is "difficult to rely heavily on precedent in
evaluating such restrictions." Nader v. Keith, 385 F.3d 729, 735
(7th Cir. 2004) (Posner, J.).

Using that method of comparison, two states use the same deadline for individual candidates as West Virginia, 16 impose an earlier deadline, and 32 have a later deadline. Of the 32 with a later deadline, however, nine are within 7 days after August 1. It is also worth noting that of the 40 states with fixed, full political party deadlines, 30 precede August 1, one falls on August 1, and nine postdate August 1.

Regarding the 2% requirement, the chart furnished by the parties indicates that 47 states impose a lower required percentage, with Oklahoma using a 3% requirement and North Carolina using a 2% gubernatorial vote that produces a presidential percentage (1.99) that is virtually the same as West Virginia. Among those 47 states with a percentage requirement below 1.99%, however, 10 impose either a 1% or greater threshold. Additionally, of those states with lower percentage requirements, 15 have a signature submission deadline earlier than August 1. The North Carolina deadline is June 12.

B.   Administration of the Election Process in West Virginia

The August 1 deadline ties directly to the date of September 23, 2008, by which absentee ballots must be distributed

to the military and other citizens.  September 23 is 42 days

prior to the November 4, 2008, general election.  <u>See</u> W. Va. Code

3-3-11(b) (noting absentee ballot delivery date of "not less than

forty-two days before the day of the election . . . .").

Additionally, federal law, with an eye to the military and other

citizens abroad, recommends that absentee ballots be mailed out

at least 45 days prior to the general election.  <u>See</u> Uniformed

and Overseas Citizens Absentee Voting Act, Pub. L. No. 99-410,

100 Stat. 924 (codified as amended in scattered sections of 42

U.S.C., 39 U.S.C., 18 U.S.C.); U.S. Election Assistance Comm'n,

Report, <u>Best Practices for Facilitating Voting by U.S. Citizens</u>

<u>Covered by the Uniformed and Overseas Citizens Absentee Voting</u>

<u>Act</u> 3 (2004).

   For the year 2008, there are 35 business work days

(Monday through Friday) between August 1 and September 23.

During that period, the Secretary must submit the remaining

certificate signatures among the 55 county clerk offices for

signature verification (of which 22,055 were filed on August 1)

and receive the reports from those counties.  The qualifying

names for the ballot are then ultimately sent on to the printer

to prepare the ballots, after which time is allotted for proof

reading the ballots, with the final ballots placed back in the

hands of the county clerks for distribution by September 23.  As will be seen, the timely completion of these tasks is not a simple one.

Three witnesses testified concerning the election administration process in West Virginia: (1) Jason Williams, Manager of the Elections Division for the Secretary of State, (2) Vera J. McCormick, Clerk of the Kanawha County Commission, and (3) John M. Denbigh, an employee of Casto & Harris, Inc., the entity responsible for providing the three types of ballots to be used in West Virginia during the 2008 general election.[6]

The Elections Division consists of 9 employees supervised by Williams.  They perform a host of duties, including (1) implementing various federal and state regulations, including the Help America Vote Act of 2002, Pub. L. 107-252, 116 Stat. 1666, 42 U.S.C. § 15301 et seq., (2) enforcing state campaign finance laws, (3) processing certificates of announcement and candidate nominations for statewide and multi-county candidacies,

---

[6]The three ballot types are (1) the traditional, conventionally printed, paper ballot ("traditional ballot"), (2) the optical scan ballot, an instrument with circles that the voter fills in with a pencil and which is then counted by an electronic scanning device ("optical scan ballot"), and (3) the direct record or touch screen ballot, the result of a programming effort using electronic media that is then inserted into a device that posts the ballot on a view screen for the voter to make his or her selection ("electronic ballot").  Each of the three ballots are formatted differently in appearance.

(4) processing duties related to the types of certificates at issue here, and (5) training local officials regarding state election procedures.

Regarding signatures submitted pursuant to section 3-5-23, the Elections Division date stamps, reviews, and counts the names as received. Each signature is counted individually, which Williams described as "a large feat when you are counting 15,000 signatures for two to three candidates." The certificates are then divided and transmitted for verification to the counties where the signers are putatively registered to vote. The certificates are often submitted by potential candidates over a staggered time period. As the necessary certificates roll in on or prior to the August 1 deadline, they are transmitted immediately to the various county clerk offices.

The county clerk offices then begin the time-consuming and tedious process of comparing the signatures with the county voter registration rolls. Some county clerk offices have only one voter registration employee besides the clerk. Others offices consist of the clerk alone. Once the work is completed, the clerk offices advise the Elections Division of the numbers of valid and invalid signatures. Mr. Williams testified that the Secretary of State has experienced a "response rate . . . [that]

has varied considerably from county-to-county." The Elections Division lacks the direct oversight authority for the counties that might assist it in expediting the process.

Ms. McCormick's office for Kanawha County, the largest county in the state, has nine employees devoted to voter registration and related duties. She was unaware of any other county clerk office with "anywhere near" the election staff at her disposal. Ms. McCormick and her staff, along with the county clerks in the remaining 54 counties, have numerous election-related duties. See Def.'s Ex. 6, Robert M. Bastress, Jr., Manual on the Duties of the West Virginia County Clerks 1-15 (June 2007).

For example, (1) Ms. McCormick presently has 700 pending requests for absentee ballots which must by law be filled beginning September 23, 2008, (2) her nine-person voter registration staff must train and maintain contact with over 1000 poll workers, (3) voter registration efforts are ongoing, and (4) she must assist in proof reading sample ballots upon receipt from Casto & Harris. The proofreading process is quite involved and a somewhat unpredictable variable within the already compressed general election time frame. For example, once Casto & Harris generates the many samples of traditional, optical scan, and

electronic ballots, they are forwarded to the counties for proofreading by a Board of Ballot Commissioners which includes the county clerk and representatives of the Democratic and Republican parties.  If an error is found, Casto & Harris is alerted.  The printer will cease printing and programming until corrections have been reviewed and approved.

Ms. McCormick noted that during the election season her office is "constantly busy."  Both she and the Casto & Harris representative, Mr. Denbigh, planned their busy schedule under the assumption that potential candidates would adhere to the various statutory deadlines.

Other critical dates, some of a statutory dimension, apply to the reticulate process of creating and disseminating the three ballot types.  (See Def.'s ex. 1, Casto & Harris, Inc. 2008 Presidential General Election Calendar (listing 19 dates preceding and postdating the August 1, 2008, deadline)).  For example, a draw is conducted for the order of appearance of candidates on the ballot "[o]n the fourth Tuesday following the close of the candidate filing."  W. Va. Code § 3-5-13a(b)(1).  The draw date fell this year on August 26, 2008.  W. Va. Code § 3-5-13a(b)(1).  After the draw, the order of appearance is transmitted to Casto & Harris the next day.

Casto & Harris then "print[s traditional ballots] seven days a week, twelve hours a day, between now" and the state statutory deadline for disseminating absentee ballots, which is, as noted, September 23, 2008.   Casto & Harris performs a single production run for the traditional absentee and election-day ballots.   Adding another candidacy to the existing traditional paper ballot, which has one column for each of the four qualified presidential tickets, will increase ballot width, with the addition of a fifth column.   The paper stock may also change and "it can increase the [ultimate] cost [to the taxpayers] quite a bit" according to Mr. Denbigh.

Mr. Denbigh also noted the demanding programming duties associated with the electronic ballots.   Unlike the traditional and optical scan ballots, he noted Casto & Harris cannot preliminarily proof the electronic ballots prior to receiving official word concerning the Republican presidential ticket on September 5, 2008, it being the last of the two major party conventions.   This is significant inasmuch as 32 of West Virginia's 55 counties use the electronic ballots.

Other printing companies sometimes help perform election-related work for Casto & Harris during the staggered primary season.   Those other outlets are now quite busy with

12

their own general election ballot contracts to fulfill.[7]

All these considerations cause the court to conclude that the presidential election time frame adopted by West Virginia, which permits nominating petitions to be filed as late as August 1, is a reasonable one in light of the geographic and population size of the state, the variety of the 55 political subdivisions through which the Secretary must function in order to carry out the verification process, and the time required for ballot preparation, printing, and delivery, including the absentee ballots that are required to be ready for delivery on September 23, 2008.

C.   The Libertarian Party's Ballot Efforts in West Virginia

William Redpath, has been a Libertarian Party member since 1984 and is presently its chairman.[8]  He is familiar with

---

[7]When confronted with the possibility of what might occur if production was delayed by a late ballot addition coming after September 5, 2008, Mr. Denbigh observed as follows:

> [I]t will cost extra expense and overtime, but even more critical to us, it will cause extra fatigue to the printers and programmers, and election production is an extremely stressful and critical process, and we can only drive our people so hard.  So it's a very deep concern.

[8]Mr. Redpath attested to the importance placed by the Libertarian Party on ballot access for its nominees for the high
(continued...)

the ballot access procedures in the 50 states and the District of
Columbia.   The Libertarian Party has run candidates in West
Virginia since at least 1980.   According to Mr. Redpath, it
qualified its presidential ticket for the ballot in West Virginia
and the remaining 50 states in 1980, 1992 and 1996, all but
Arizona in 2000 and all but Oklahoma and New Hampshire in 2004.
Mr. Redpath observed that, based upon the votes received by the
Libertarian Party gubernatorial candidate in the 1996 general
election, 16,171, it achieved automatic ballot access for the
2000 general election in West Virginia.   In the 2000 general
election, however, its gubernatorial candidate, Bob Myers,
received only 5,548 votes, which was less than 1% of the total
votes cast for that office.

       That disappointing result caused the Libertarian Party
to lose automatic ballot access in West Virginia.   It then had to
satisfy the 2% requirement and the August 1 deadline in order for
its presidential ticket to appear on the West Virginia ballot for

---

[8](...continued)
executive offices: "I mean, no -- no ballot status, no political
party in the long run."   The visibility of Representative Barr
has helped the cause.   He is a former member of the United States
House of Representatives from Georgia between 1995 and 2003.   Mr.
Redpath noted that Representative Barr has "clearly gotten more
media attention than any of the other presidential tickets" in
Libertarian Party history, having appeared this election cycle on
The Colbert Report, ABC's This Week With George Stephanopoulos,
CNN, and Fox News. His name and associated media coverage have
doubtless aided the signature gatherers.

the 2004 general election.  The Libertarian Party met the two
requirements that year.  Additionally, it has been aware of the
now challenged two requirements from the moment each became law.
Despite that fact, the Libertarian Party has never challenged the
two requirements jointly in prior general election cycles.  In
sum, the Libertarian Party's presidential ticket has appeared on
the ballot in West Virginia for at least the last four general
elections.

The Libertarian Party's 2008 convention nominated
Representative Barr and Mr. Root on May 25, 2008.  The subject of
ballot access in the various states had been in the planning
stages by the Libertarian Party well prior to that time though.
Libertarian Party volunteers began soliciting for signatures on
nominating petitions in North Carolina as early as general
Election Day 2004.  According to the chart submitted by the
parties, North Carolina's signature requirement is essentially
equivalent to the 2% requirement.

The timing of the Libertarian Party and the Barr/Root
campaign for 2008 in West Virginia was quite different.  The
Barr/Root campaign commenced its signature-gathering efforts here
on either July 13 or 15, 2008.  Once it commenced, the Barr/Root
campaign employed (1) 37 paid petitioners, (2) 14 volunteer

petitioners, (3) 10 petitioners secured for them by a third-party petitioning contractor, and (4) supervisory personnel in West Virginia.   The Barr/Root campaign spent $45,000 of its own money to gain ballot access in West Virginia, with most of the money used to compensate the non-volunteer petitioners.[9]   On the other hand, the Libertarian Party has spent $400,000 to $500,000 this election cycle -- $300,000 of it in 2008 -- to obtain ballot access in the approximately 30 states where it did not already exist.   No Libertarian Party funds have been expended in West Virginia.

Mr. Redpath testified the Libertarian Party's timing in West Virginia was deliberate, despite it being left with only 17-19 days before the August 1 deadline.   As noted, despite the late start, as of August 1 the Barr/Root campaign had submitted certificates to the Elections Division bearing the signatures of 13,171 individuals.   During the next 19 days, 10,650 more were apparently gathered and submitted on August 20.   In gross terms of unvalidated signatures, then, the 2% requirement was met over the course of a period of 36-38 days.[10]

---

[9]Plaintiffs contend the $45,000 spent by the Barr/Root campaign for ballot access in West Virginia is on the "high end" compared to lower amounts expended by it in other states.   The nature of the expenditures is not clear.   The sum expended might just as easily have resulted from a last-minute rush, with as many personnel as possible, to try and meet the two requirements.

[10]Based upon the summary of signatures gathered by the
(continued...)

Had the effort started just two to three weeks earlier, it seems clear enough that the two requirements would have been met. Mr. Redpath conceded the Barr/Root campaign could have started earlier in West Virginia, as it did in North Carolina on Election Day 2004.

Mr. Redpath admitted the delay in West Virginia was a calculated one. It was determined the Libertarian Party would not petition in Oklahoma and West Virginia early because, he suggested, the two states "in terms of number of signatures needed divided by the vote totals for President in the past or the population . . . [are] the two states where that ratio is highest." The Barr/Root campaign decided to come to West Virginia when its fund raising prospects brightened.[11] The Libertarian Party presently has $15,000 in its coffers, with payables totaling $50-60,000. The Barr/Root campaign's finances are unstated.

---

[10](...continued)
Libertarian Party thus far in 2008, and assuming the 72.09% validation percentage for the first 2,963 holds fast, the 20,860 signatures furnished August 1 and 20, 2008, would equal 15,038, for a grand total of projected validations of 17,174.

[11]Mr. Redpath also noted briefly that the $2,500 filing fee in West Virginia, when compared with other states, but noting only Colorado, ranks "high."

17

The Libertarian Party has presently achieved 2008 ballot access in 41 states, with hopes of making it on at least five more.  Of the remaining four states, Oklahoma, West Virginia, Maine, and Massachusetts, litigation is ongoing.  The Libertarian Party will not seek access in the District of Columbia.

II.

A.   Application of the <u>Anderson</u> Test

Candidates for political office enjoy both a First and Fourteenth Amendment right to participate equally in the electoral process and associate with one another to achieve policy goals. See <u>Burdick v. Takushi</u>, 504 U.S. 428, 433 (1992); <u>Anderson v. Celebrezze</u>, 460 U.S. 780, 787-88 (1983).  When the states regulate ballot access, as they all do, they also necessarily fetter to some degree the voters' rights to associate with one another and cast their ballots as they see fit. <u>Williams v. Rhodes</u>, 393 U.S. 23, 30 (1968).  This is especially the case when the regulations impact those who are disenchanted with the two major parties.  See <u>id.</u>

18

It has been observed though that "these general principles are not to be interpreted as an open sesame for minor parties and individuals who want to appear on the ballot with the major candidates." <u>Socialist Workers</u>, 890 F.2d at 1304.  It is well settled that states have an "important . . . interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot -- the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." <u>Jenness v. Fortson</u>, 403 U.S. 431, 442 (1971).  In an effort to provide some means for adjudicating where the lines are properly drawn when such weighty interests collide, the Supreme Court in <u>Anderson</u> established a settled framework.  Our court of appeals summarized the inquiry as follows:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It must then identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

> [<u>Anderson</u>,] 460 U.S. at 789, 103 S.Ct. 1564. Even prior to articulating this test, the Court expressly recognized that "reasonable, nondiscriminatory

> restrictions" generally can be justified by "the
> State's important regulatory interests."  If a filing
> deadline inflicts a "severe" burden, however, it must
> be "narrowly drawn to advance a state interest of
> compelling importance."

Wood II, 207 F.3d at 710 (4th Cir. 2000)(citations omitted); see

also Burdick v. Takushi, 504 U.S. 428, 434 (1992); Fishbeck v.

Hechler, 85 F.3d 162, 164 (4th Cir. 1996); McLaughlin v. North

Carolina Bd. of Elections, 65 F.3d 1215, 1220-21 (4th Cir. 1995)

("In short, election laws are usually, but not always, subject to

ad hoc balancing."); Wood v. Meadows, 117 F.3d 770, 772 (4th Cir.

1997)("Wood I"); Socialist Workers, 890 F.2d at 1305; Libertarian

Party v. Davis, 766 F.2d 865, 868 (1985).


1.  The Character and Magnitude of the Asserted Injury


Plaintiffs contend that the two requirements infringe

"their fundamental rights to participate in an electoral process

that is fair and impartial, to advocate their views, and to

promote the" Barr/Root campaign.  (Pls.' Mem. in Supp. at 3).

They assert that without ballot access Barr and Root will be

burdened with a lack of credibility, reduced media coverage,

resort to a write-in campaign, and their supporters' political

rights will be seriously compromised as well.  All of the

injuries identified by plaintiffs are significant ones.  But they

cannot be considered in a vacuum.   Settled case law illustrate the identified injuries do not carry their usual force here.

Many years ago, this court concluded that the former 1% signature requirement that existed up to June 11, 1999, "plainly withst[ood] constitutional attack" based in part upon Supreme Court precedent found in Jenness that is now near four decades old.   See Socialist Workers Party v. Hechler, 696 F. Supp. 190, 195 (S.D. W. Va. 1988).   That same precedent strongly suggests the two requirements also pass constitutional muster.

In Jenness, a unanimous Supreme Court upheld a statutory scheme requiring the signatures of five percent of Georgia's registered voters eligible to vote in the preceding election, being three times the 2% requirement here that is based on the lesser figure of votes cast.[12]   The Georgia scheme also had a less well-known component: "The total time allowed for circulating a nominating petition is 180 days, and it must be filed on the second Wednesday in June, the same deadline that a candidate filing in a party primary must meet."   Id. at 433-34 (emphasis supplied).

---

[12]Assuming a 75% voter turnout in the preceding election, 2% of the votes cast would be but 1.5% of the registered vote -- which in turn would be less than one-third of Georgia's 5% registered vote requirement approved in Jenness.

21

Like plaintiffs here, the proponents for striking the Georgia requirement made much of the fact that "[t]he 5% figure [wa]s, . . . somewhat higher than the percentage of support required . . . in many States . . . ." Id. at 442. The argument was rejected inasmuch as Georgia's higher requirement was balanced by other indications of ballot openness:

> So far as the Georgia election laws are concerned independent candidates and members of small or newly formed political organizations are wholly free to associate, to proselytize, to speak, to write, and to organize campaigns for any school of thought they wish. They may confine themselves to an appeal for write-in votes. Or they may seek, over a six months' period, the signatures of 5% of the eligible electorate for the office in question. If they choose the latter course, the way is open. For Georgia imposes no suffocating restrictions whatever upon the free circulation of nominating petitions. A voter may sign a petition even though he has signed others, and a voter who has signed the petition of a nonparty candidate is free thereafter to participate in a party primary. The signer of a petition is not required to state that he intends to vote for that candidate at the election. A person who has previously voted in a party primary is fully eligible to sign a petition, and so, on the other hand is a person who was not even registered at the time of the previous election. No signature on a nominating petition need be notarized.

Jenness, 403 U.S. at 438-39.

While not addressing the constitutionality of the filing deadline, the Supreme Court characterized the June date as "not . . . unreasonably early . . . ." Jenness, 403 U.S. at 438; see also Wood I, 117 F.3d at 775 (noting Jenness considered only the constitutionality of the 5% requirement but also noted

Georgia had "not fix[ed] an unreasonably early filing deadline for candidates not endorsed by established parties.").

An examination of similar provisions in West Virginia indicates even greater ballot access. Registered voters who reside in any part of the state may sign their names for as many putative candidates as they wish. Those same signers may then vote in a party primary. If they voted in a previously held party primary, they may still sign. In either case, the signers need not pledge allegiance to the ballot seeker. Also, signature gatherers need not be West Virginia residents, and there is no signature notarization requirement. Perhaps most importantly, signatures can be sought at any time.[13]

This unrestricted pool of West Virginia registered voters from whom nominating petition signatures may be obtained became largely available by the time the 2% requirement became effective in 1999. The last barrier was removed by the Legislature in 2005.[14]

---

[13]Additionally, like the Georgia scheme at issue in Jenness, "[t]he open quality of the . . . system is far from merely theoretical." Jenness, 403 U.S. at 431. Since 2000, the Reform, Libertarian, and Constitution parties have all satisfied the two requirements at various times.

[14]In 1999, the Legislature amended section 3-5-23(f) with a
(continued...)

23

In light of <u>Jenness</u>, the apparent openness of the West
Virginia scheme <u>in toto</u>, and the lack of any showing that the two
requirements have previously worked to disqualify aspiring
presidential candidates from the ballot[15], the court concludes
that the two requirements, separately or in concert, do not
constitute a severe burden warranting any form of heightened
scrutiny.[16]  See also, e.g., <u>Wood I</u>, 117 F.3d at 774 (remanding

---

[14](...continued)
proviso that no criminal penalty could be imposed upon one who
voted in the primary election immediately following the date when
they signed a certificate.  In 2005, the Legislature struck the
requirement that those seeking signatures read aloud to potential
signers a warning that by executing the certificate, they
forfeited their ability to vote in the next primary election.

[15]<u>Libertarian Party of Washington v. Munro</u>, 31 F.3d 759, 763
(9th Cir. 1994) (finding significant that the "the Libertarians
cite no instance in which any candidate ever has been denied
access to the Washington ballot, or otherwise has been
disadvantaged, because of the procedures they assail.").

[16]Our court of appeals' decisions applying strict scrutiny
are not to the contrary.  In <u>Miller v. Brown</u>, 503 F.3d 360, 364
(4th Cir. 2007), the court of appeals addressed an open-primary
law.  In <u>McLaughlin</u>, election laws were examined containing more
unusual provisions, including the payment by a would-be new party
of a five cent per signature verification fee.  In applying
strict scrutiny, the court of appeals noted the challenged
restrictions "ma[d]e it extremely difficult for any 'third party'
to participate in electoral politics."); <u>Dixon</u>, 878 F.2d at 786
(4th Cir. 1989) (noting the "serious infringement" of First
Amendment rights represented by a law requiring that non-indigent
write-in candidates file certificates of candidacy and pay a
filing fee of $150 in order to become "official" candidates and
have the votes cast for them reported publicly).  The
circumstances presented in this action are quite different.

case but noting that despite a factual "record . . . virtually barren of any evidence of the strength or legitimacy of the Commonwealth's interests" that the court of appeals "share[d] the Commonwealth's skepticism as to whether, as a matter of both law and fact, Wood can show that the 150 day deadline imposes any cognizable burden on his independent candidacy, much less a 'severe' one."); Swanson, 490 F.3d at 910 ("[W]e conclude that Alabama's filing deadline on the primary election date, in tandem with the three-percent signature requirement, is a reasonable, nondiscriminatory regulation."). The two requirements constitute only a reasonable, non-discriminatory burden.[17]


2. The Precise Interests Advanced by the State as Justifications for the Burdens Imposed


The Secretary advances a host of interests supporting the two requirements. They include the following: (1) requiring potential candidates to show some minimal level of support for

---

[17]Mr. Redpath appeared to suggest that the more rural nature of West Virginia makes signature gathering very difficult, somehow heightening the seriousness of the two requirements. (See Test. of William Redpath ("So it can be very difficult for petitioners in a situation where there isn't good street traffic in terms of sidewalks and pedestrians, it can be very difficult in those situations to find places where there are enough people to make it worthwhile petitioning.")). One answer is to set up the petition drive in some of the 11 most populous counties which together hold half of the state's 1.8 million inhabitants, and in each of which there is a principal city.

their candidacy by the electorate, (2) halting the waste and
confusion that might otherwise result from a lack of that
showing, (3) avoiding disruption of the ballot and election
preparation processes, (4) avoiding the perception of unequal
treatment that would result if plaintiffs were permitted by court
intervention to evade the petition process when others more
diligent have successfully expended the time and resources
necessary to comply with state law, (5) assuring honest
elections, and (6) avoiding disruption of ongoing voter
education, poll worker training, and impending responsibilities
to assure ballot accuracy and timely distribution of absentee
ballots.

        Each of the foregoing interests find strong support in
settled case law, the evidentiary record summarized in section
I.B, or both.  Additionally, it is well-settled that "'when a
state election law provision imposes only "reasonable,
nondiscriminatory restrictions" upon the First and Fourteenth
Amendment rights of voters, "the State's important regulatory
interests are generally sufficient to justify" the
restrictions.'" Fishbeck, 85 F.3d at 164 (quoting Burdick, 504
U.S. at 432-36 (quoting Anderson, 460 U.S. at 788)); Wood I, 117
F.3d at 773 ("Indeed, 'when a State's ballot access laws pass
constitutional muster as imposing only reasonable burdens on

26

First and Fourteenth Amendment rights,' a particular restriction 'will be presumptively valid, since any burden on the right to vote for the candidate of one's choice will be light and normally will be counterbalanced by the very state interests supporting the ballot access scheme.'" (quoting Burdick, 504 U.S. at 441); Dixon, 878 F.2d at 779.

The court has considered plaintiffs' contention, based upon Wood II and many other cases, that states have a diminished interest in creating ballot-access requirements for candidates seeking the presidency. In considering this important limit, however, it must be remembered that Anderson necessarily recognizes a state may still regulate the ballot in the presidential election context. See Coalition for Free and Open Elections, Prohibition Party v. McElderry, 48 F.3d 493, 501 (10th Cir. 1995) ("Anderson does not . . . stand for the proposition that every state regulation of Presidential elections will fail to pass constitutional muster. Instead, . . . Anderson simply instructs us to consider the uniquely national interests involved in Presidential elections when we balance the interests at stake.").

It is of particular note that Jenness did not involve the ballot access of presidential candidates. It is significant

27

though that _Jenness_ implicitly found unobjectionable the
combination of a signature threshold three times that of the 2%
requirement and a submission date roughly seven weeks prior to
the August 1 deadline.  It is also noteworthy that under the
scheme approved in _Jenness_, the total time allotted for
circulating petitions was 180 days, a time limitation absent
here.  In sum, the state's interest is lessened here, but the two
requirements, and West Virginia ballot-access rules generally,
are also far more generous than their counterparts in _Jenness_.

Additionally, to the extent state rules result in the
timely and orderly preparation of presidential election ballots,
they serve the overriding national interest.  That consideration
is especially appropriate here inasmuch as the Legislature has
demonstrated an understanding of the need, and its readiness, to
bend to the asserted national interest.  The point was made by
this court's 1995 decision in _Hess_:

> The statute currently in effect, which permits
> presidential and vice presidential candidates to file
> by August 1st, but continues to require all other
> candidates to comply with the primary eve filing
> deadline, was enacted in 1986.  _The change to a later_
> _date for the offices of president and vice president_
> _was made in response to the decision by the United_
> _States Supreme Court_ in _Anderson v. Celebrezze_ . . . .

28

Id. at 1142 (emphasis supplied).[18] If a state, as here, adopts reasonable and non-discriminatory ballot requirements for presidential candidates, its actions help assure that the contest takes place with a minimal chance for disruptions, confusion, and errors.

The burden imposed is slight. Registered voters can be freely solicited for their signatures at any time, but in particular during at least four critical time periods: (1) during November and December as voter interest begins to build preceding the January primaries; (2) during February and March as the primary season hits full stride and voter interest increases sharply; (3) during the spring when the primary process ends, well prior to the major-party conventions; and (4) after the primaries down to August 1, during which time the presumptive nominees of the major parties are generally known, often long

---

[18]The Anderson decision recognized that the major party political conventions are "regularly held during the summer." Anderson, 460 U.S. at 804 (noting also that "the national scope of the competition for delegates at the Presidential nominating conventions assures that 'intraparty feuding' will continue until August."). It is reasonable to conclude that the Legislature, in fashioning the August 1 deadline in 1986, took note of this observation in an attempt to treat those other than the major parties in the most equitable manner.

before this last period even begins.[19]

The heightened interest in the presidential electoral process generated by the cascading political activity of the first seven months of a presidential election year serves to stamp that period alone as an ideal and sufficient one in which to collect the signatures representing the modicum of support that the 2% requirement envisions.

Moreover, it seems clear that the August 1 deadline is nearly as generous as the state can afford to be while yet reserving enough time to discharge its election-related duties and account for unexpected disruptions.  The sovereign need not pick a perfect deadline, just one that is, essentially, reasonable in light of the burdens imposed.  See Libertarian Party of Washington, 31 F.3d at 764 ("The Libertarians contend that the state could streamline its system and verify signatures in a shorter period of time.  No doubt this is true.  But, because the current scheme poses only a minuscule burden for

---

[19]It is noted also that by June, often well before the nominating conventions, the dust has largely settled around the major party primary candidates, with one emerging as the presumed nominee.  See Nader v. Keith, 385 F.3d 729, 736 (7th Cir. 2004) ("Long before the June deadline it was not only certain who the major parties' candidates would be but their positions were well known, the candidates were campaigning vigorously, there was a high level of public interest in the campaign . . . .")

minor party candidacies, the Constitution does not require Washington to adopt a system that is the most efficient possible . . . .").

In sum, West Virginia has articulated legitimate interests justifying its reasonable, nondiscriminatory ballot-access requirements.  There is, accordingly, no basis for interfering with the state scheme.  See Crawford v. Marion County Election Bd., 128 S. Ct. 1610, 1623 (2008) ("When evaluating a neutral, nondiscriminatory regulation of voting procedure, '[w]e must keep in mind that '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'")(citations omitted)(per Stevens, J., with two justices concurring and three justices concurring in the judgment.).

B.    Alleged Disparity in Nominee Reporting

Plaintiffs also suggest West Virginia "lacks a sufficient reason for requiring [submission of] nominating certificates . . . by August 1st while permitting the major parties an additional month to identify their candidates." (Compl. ¶ 21).  Assuming the variance is material given the foregoing analysis, the major party convention dates are not set in stone.  In five of the seven presidential years from 1980

31

through 2004, one of the two major party conventions was held in
July and the other in August; in one year both were held in
August; and in 2004 one was held in July and the other from
August 30 to September 2.  The unusual timing this year suggests
an anomaly.

Plaintiffs cite no authority for the proposition that,
in setting election-related deadlines, a state must forestall the
possibility that the deadline date for the signed certificates
might fortuitously work a minor disadvantage on an office seeker
in a given year.  In any event, the court discerns no
constitutional violation.  The foregoing discussion, and that
which follows, disposes of plaintiffs' claim.  Cf. Libertarian
Party of Washington, 31 F.3d at 760 (holding constitutional a
Washington state election procedure that effectively required
minor party candidates to announce their candidacies four to five
weeks earlier than major party candidates "[b]ecause the
challenged procedures have a rational basis and impose only a de
minimis burden on the Libertarians' constitutional rights[.]")

C.    Timing

Apart from the foregoing analysis, plaintiffs' proof
fails in another critical respect.  Other factors warrant the

32

denial of relief.  The Libertarian Party has known about the joint effect of the two requirements once the 2% requirement was enacted in 1999.[20]  The Libertarian Party satisfied the two requirements when its presidential ticket achieved West Virginia ballot access in 2004.  A third-party and an independent presidential ticket have already complied with the West Virginia requirements and achieved ballot access for the 2008 general election.  Libertarian Party representatives started seeking signatures for the 2008 general election in a nearby state with comparable requirements, North Carolina, as early as 2004 but waited to seek signatures in West Virginia until 17-19 days prior to the August 1 deadline.  Additionally, over the course of those 17-19 days the Libertarian Party garnered 13,171 signatures in West Virginia, just 1,947 short of the 2% requirement of 15,118, had those signatures all been valid.  Just 19 days after the deadline, they had collected and filed an additional 10,652 signatures.

It seems clear enough the Barr/Root campaign would have satisfied the two requirements had they commenced their efforts

---

[20]In 1995, the Libertarian Party advocated an August 1 deadline for candidacies other than the presidency, while conceding such a change was not "constitutionally required." Hess v. Hechler, 925 F. Supp. 1140, 1141 (S.D. W. Va. 1995) ("In their complaint, plaintiffs seek to compel the defendant to accept . . . signatures through at least August 1st of each election year.").

just two to three weeks earlier.  They were free to commence
their signature-seeking efforts at any time.

These factors combine to strongly suggest the two
requirements are not the cause of plaintiffs' injury.  Instead,
it was their lack of reasonable diligence that ultimately
thwarted their effort to gain ballot access here for the 2008
general election.

                              III.


Based upon the foregoing, the court FINDS, CONCLUDES,
and DECLARES that plaintiffs have failed to demonstrate in either
fact or law that the challenged two requirements offend the First
and Fourteenth Amendments.  The court, accordingly, ORDERS that
this civil action be, and it hereby is, dismissed and stricken
from the docket.

The Clerk is directed to forward copies of this written
opinion and order to counsel of record.

                    DATED: September 5, 2008


                    _____
                    John T. Copenhaver, Jr.
                    United States District Judge


                              34